# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ELIJAH JACKSON,

       *Plaintiff*,

v.

DISTRICT OF COLUMBIA *et al.*,

       *Defendants*.

Civil Action No. 15-2247 (TJK)

## MEMORANDUM OPINION AND ORDER

Early in the morning on May 5, 2015, Plaintiff Elijah Jackson struck a moped while driving, drunk, with two companions. After leaving the scene of the accident, Jackson was pulled over by the police. What happened next is disputed. According to the officers, Jackson resisted arrest and they used reasonable force in restraining him. According to Jackson, the officers maliciously beat him even though he tried to comply with their orders. He subsequently underwent neck surgery, and claims to suffer from post-traumatic stress disorder as a result of the incident.

Jackson has sued the District of Columbia (the "District") and seven individual police officers: John Merzig, Matthew Fogle, Kanika Bolton, Carol Smith, Antoine Braithwaite, Lorelei Hillgren, and Michael Harrison. He brings claims for violations of the Fourth and Fifth Amendments to the U.S. Constitution, assault and battery, and intentional infliction of emotional distress. Defendants have moved for partial judgment on the pleadings and partial summary judgment on Jackson's Fifth Amendment claim against all Defendants; on all claims against Defendants Bolton, Smith, Braithwaite, Hillgren and Harrison; and on Jackson's claim against the District for municipal liability under 42 U.S.C. § 1983. ECF No. 35. For the reasons explained below, the motion will be granted in part and denied in part. The Court will dismiss

the Fifth Amendment claim in its entirety. It will also grant summary judgment for Harrison on all claims, for Smith and Bolton on the intentional infliction of emotional distress claim, and for the District on the municipal-liability claim. The motion will otherwise be denied.

## I. Factual and Procedural Background

### A. The Night of May 4-5, 2015, and its Aftermath

On the evening of May 4, 2015, Jackson met up with a friend named Jordathan Jones and Jones's "lady friend." Pl.'s Ex. 1 (Jackson Dep.) at 20:2-17, 21:13-17.[1] Jones, using a borrowed car, drove the group to a strip club in downtown Washington, D.C. Pl.'s Ex. 1 (Jackson Dep.) at 21:5-12, 22:9-23:22. Jones and his "lady friend" went in, while Jackson waited for them in the car. *Id.* at 23:9-17. The couple returned after an hour or two, and all three headed to a liquor store in Maryland (the liquor stores in Washington were closed by that hour). *Id* at 25:16-21. They purchased tequila. *Id.* at 26:11-14. At that point, Jackson took over the driving, drinking "more than a pint" of the tequila as he went. *Id.* at 26:20-28:11, 154:10-17.

At around 1:30 in the morning, while driving along Florida Avenue in Northeast Washington, near Gallaudet University, Jackson struck a moped. *Id.* at 28:18-21, 30:17-31:14; Compl. ¶ 11. In Jackson's telling, the crash was a minor one and he exchanged information with the moped driver. Pl.'s Ex. 1 (Jackson Dep.) at 29:2-18. However, the moped driver was irate and insisted on receiving compensation for the accident then and there, prompting Jackson to

---

[1] In considering the instant motion, the Court considered all relevant filings, including the following: ECF No. 1 ("Compl."); ECF No. 26-1 ("Longo Supp. Rep."); ECF No. 35 ("Defs.' Br."); ECF No. 35-1 ("Defs.' Ex. 1"); ECF No. 35-2 ("Defs.' Ex. 2"); ECF No. 35-3 ("Defs.' SoMF"); ECF No. 36 ("Pl.'s Opp'n"); ECF No. 36-1 ("Pl.'s Resp. SoMF"); ECF No. 36-2 ("Pl.'s Ex. 1"); ECF No. 36-3 (Jackson's exhibits 2 through 17, each of which is cited as "Pl.'s Ex. __"); ECF No. 39 ("Defs.' Reply"); ECF No. 39-1 ("Defs.' Reply SoMF").

drive away, ostensibly to seek police protection. *Id.* at 29:15-30:16. Shortly afterward, he was

pulled over by a police car with its lights flashing and exited the vehicle. *Id.* at 32:8-33:14.

Jackson and the police officers differ on what happened next. The record before the

Court is largely silent regarding the views of Officers Merzig and Fogle, the two officers who

initially pulled Jackson over, *see* Compl. ¶ 13.[2] It does reflect the accounts of the officers who

came on the scene shortly afterward: first Officers Smith and Bolton, followed later by Officers

Braithwaite and Hillgren. *See* Pl.'s Ex. 4 (Bolton's written report); Pl.'s Ex. 5 (Braithwaite's and

Hillgren's written statements). According to these officers, Jackson was already "combative"

and resisting arrest by the time they arrived, requiring the use of force to restrain him. *See* Pl.'s

Ex. 3 (Smith Dep.) at 24:19-25:19, 28:10-29:5, 30:22-31:14; Pl.'s Ex. 4 (Bolton's written report)

at 3; Pl.'s Ex. 5 (Braithwaite's and Hillgren's written statements). Smith reports that she was

able to handcuff only one of Jackson's wrists at this point. Pl.'s Ex. 3 (Smith Dep.) at 38:21-

39:3. One of the officers used pepper spray to subdue Jackson, but according to Smith, it was

ineffective. *Id.* at 31:19-32:4. The officers then employed a "tactical takedown" or "leg sweep,"

a police maneuver in which officers sweep an arrestee's legs out from under him in order to

place the arrestee on the ground and restrain him. *See id.* at 36:22-38:2, 39:11-13. Once Jackson

was on the ground, officers were able to finish handcuffing him. *See id.* at 38:7-14. Smith

testified that the officers did not use additional force, for example by punching or kicking

Jackson, during the takedown. *See id.* at 40:7-17.

---

[2] The Court notes that Jackson's expert summarizes the testimony of Merzig and Fogle, as well as other witnesses, in his supplemental report. *See* Longo Supp. Rep. at 3-9. The Court has not relied on this hearsay summary for the truth of the matters asserted by these witnesses, but only on the testimony actually in the record. *See Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 969 (D.C. Cir. 2016), *cert. denied*, 138 S. Ct. 88 (2017).

In Jackson's account, by contrast, the officers gratuitously beat him notwithstanding his efforts to comply with their instructions. He claims that Fogle instructed him to return to his car, but that before he could do so, Fogle and Merzig "rushed up" and grabbed him. Pl.'s Ex. 1 (Jackson Dep.) at 36:3-37:17, 46:8-11. One of the officers, Jackson testified, slammed his face into the top of the car, and the two officers began "trying to pull" him in "different directions." *Id.* at 39:11-41:11. Then Smith and Bolton arrived. *See id.* at 43:8-10, 161:1-13. Jackson claims that Smith yelled, "Hey, what are you guys doing to him?" *Id.* at 43:14-19. In response, Fogle and Merzig stopped struggling with Jackson. *Id.* at 43:20-22. Smith asked Jackson to let her handcuff him, and Jackson began to comply by holding out his left wrist (another officer still had hold of his right arm). *Id.* at 44:9-18, 161:1-22. Despite his compliance, Jackson claims, Fogle "maced" him with pepper spray, causing him to clutch instinctively at his face. *Id.* at 44:18-22, 46:5-7. The pepper spray affected Smith as well. *Id.* at 46:19-47:2.

At that point, Jackson testified, Merzig and Fogle began "punching and hitting" him as he stood blinded by the pepper spray. *See id.* at 47:3-15. Eventually, "other officers" joined in, *id.* at 47:19-48:6, apparently including Hillgren and Braithwaite, *see id.* at 59:2-7, 162:13-163:2. Jackson heard someone yell, "Take him down." *Id.* at 49:18-19. An officer hit his thigh, causing him to lose his balance, and he "was slammed face-forward down towards the ground." *Id.* at 49:19-50:15. After he fell, Jackson claims, an officer's knee kept him pinned to the ground, trapping his hands underneath his body. *Id.* at 50:16-22, 51:22-52:2. The officers "continued punching and hitting" him in his head and body. *Id.* at 50:21-51:2. Someone doused him with pepper spray a second time. *Id.* at 51:7-11. Finally, one of the officers instructed Jackson to put his hands behind his back so that he could be handcuffed, and Jackson explained that he could not. *Id.* at 52:12-53:1. At that point, the officers relented and Jackson was able to reach out his

hands to be cuffed.  *Id.* at 53:2-22.  The officers sat Jackson upright on the curb.  *Id.* at 54:1-4.

After Jackson requested help getting the pepper spray out of his eyes, one of the officers said,

"We need to clean him up."  *Id.* at 55:4-11.  They began to wipe his face and had him blow his

nose.  *Id.* at 55:21-56:10.

Sergeant Harrison performed the preliminary investigation into the officers' use of force

against Jackson.  *See* Pl.'s Ex. 7 (Harrison Dep.) at 32:10-33:13.  He arrived after Jackson was

already in handcuffs.  *Id.* at 40:2-6.  Even at that point, Harrison testified, Jackson remained

"combative" and visibly intoxicated.  *Id.* at 31:6-7, 38:11-39:7.  He observed that Jackson was

bleeding, and could smell pepper spray in the air.  *Id.* at 29:3-15.  He did not consider the

incident to have involved a serious use of force, however, because police commonly use pepper

spray and minor injuries often cause bleeding.  *Id.* at 30:3-20.  Still, because Jackson was

bleeding, he was transported by ambulance to the hospital with Braithwaite.  *See id.* at 32:15-19,

39:21-40:1.  Testing at the hospital revealed that Jackson had a blood alcohol level of .201.  *See*

Pl.'s Ex. 2 (medical personnel's testimony) at 53:24-54:12.

Jackson remained at the hospital for several days.  *See* Pl.'s Ex. 1 (Jackson Dep.) at

78:19-20.  He was diagnosed with a broken nose and a bulging intervertebral disc in his neck,

which required surgery to replace the disc with a metal plate.  *See id.* at 75:4-76:10; Pl.'s Exs. 8-

11 (medical records).  He subsequently sought psychiatric treatment and was diagnosed with

post-traumatic stress disorder.  Pl.'s Ex. 1 (Jackson Dep.) at 96:13-99:21.  He reports feeling

overwhelming anxiety around police officers, particularly District officers.  *Id.* at 109:13-111:1,

113:18-116:15.

Jackson was subsequently charged with several misdemeanors in the Superior Court of

the District of Columbia.  Compl. ¶ 21.  He stood trial on three counts of misdemeanor assault on

a police officer (specifically, Merzig, Fogle and Braithwaite) and one count of fleeing a law enforcement officer. *Id.* ¶ 22. After trial, he was convicted of assault on a police officer with respect to Merzig and Fogle, as well as fleeing a law enforcement officer; he was acquitted of assault on a police officer with respect to Braithwaite. *Id.* ¶ 23.

## B. The District's Policies Regarding Use-of-Force Investigations

In addition to evidence regarding the particular facts of Jackson's case, the parties have also introduced evidence about how the District handles use-of-force investigations. Jackson engaged an expert witness on police practices, former Charlottesville, Virginia, police chief Timothy J. Longo, Sr., who was asked to provide opinions on two subjects: (1) "whether the District had a custom, practice, or policy, of excessive force that was conscious[ly] and deliberately enforced[,] and whether such a de facto policy or custom or practice was [the] moving force behind Mr. Jackson's injures;" and (2) "whether the District of Columbia and [its police department] had a custom, practice or policy of deliberately and consciously failing to investigate uses of force[,] and whether those practices, customs or policies were the moving force behind Mr. Jackson's injuries." Defs.' SoMF ¶ 15 (quoting Defs.' Ex. 2 (Longo Dep.) at 43:20-44:2, 44:18-45:2); *see* Pl.'s Resp. SoMF ¶ 15; Longo Supp. Rep. at 2. Longo declined to offer an opinion regarding subject (1). Defs.' SoMF ¶ 16; Pl.'s Resp. SoMF ¶ 16; Longo Supp. Rep. at 17. With respect to subject (2), Longo testified that "the District did in fact have a de facto policy" of "failing to . . . investigate uses of force, particularly the uses of force such as that which was impacted upon Mr. Jackson." Defs.' SoMF ¶ 17 (quoting Defs.' Ex. 2 (Longo Dep.) at 45:6-10); *see* Pl.'s Resp. SoMF ¶ 17; Longo Supp. Rep. at 17. This policy, he concluded, "was the moving force behind Mr. Jackson's injuries." Longo Supp. Rep. at 17.

The background for Longo's analysis is a 2001 Memorandum of Agreement ("MOA") that the District entered into with the Department of Justice. *See generally Hunter v. District of*

*Columbia*, 824 F. Supp. 2d 125, 134-35 (D.D.C. 2011) (discussing MOA); *Byrd v. District of Columbia*, 297 F. Supp. 2d 136, 139-42 (D.D.C. 2003) (similar). The MOA required a number of reforms intended to reduce the risk that District police officers would use excessive force. *Byrd*, 297 F. Supp. 3d at 140. Among other things, the MOA imposed standards for investigations into use of force by police officers. *See* Pl.'s Ex. 13 (2016 Bromwich report) at 42. The MOA also called for an independent monitor to assess the District's compliance with the agreement. *Id.* at ii-iii. The monitorship ended in 2008. *Id.* at iii. In 2015, the District hired The Bromwich Group (which included members of the original monitor team) to perform a follow-up investigation into developments since the end of the monitorship. *See id.* at iii & n.3; Longo Supp. Rep. at 10. The Bromwich Group issued a report of its findings in 2016. Pl.'s Ex. 13.

The report, as described by Longo,[3] criticized the District for having relaxed its standards for how to investigate, document and audit officers' use of force after the monitorship ended. *See* Defs.' Ex. 2 (Longo Dep.) at 53:10-54:7, 58:20-59:11; Longo Supp. Rep. at 10-11. In particular, on the day the monitorship ended in June 2008, the police department issued a policy announcement by means of a "teletype." Pl.'s Ex. 14 (teletype dated June 13, 2008). The teletype changed the department's policy for investigating officers' use of "hand controls" and "resisted handcuffing" where those practices did not result in injury or a complaint of pain or injury. *Id.* In those cases, a "Use of Force Incident Report" and follow-up investigative reports would no longer be automatically required. *Id.* Instead, the relevant watch commander would determine whether to complete a Use of Force Incident Report; if not, the watch commander

---

[3] While Jackson has introduced a few brief excerpts of the 2016 Bromwich report into the record, *see* Pl.'s Ex. 13, those excerpts do not appear to include all of the conclusions that Longo relied on in crafting his own opinion.

would simply note the incident in his daily report. *See id.* The District justified these changes on the basis that investigations into minor uses of force were not turning up constitutional violations or other misconduct, and that the time spent on these investigations kept supervisors "off the streets," where they could be actively supervising their subordinates. *See* Longo Supp. Rep. at 10-11.

Jackson also points to two later police-department teletypes, both issued in July 2014. On July 3, 2014, the department issued a teletype listing the use-of-force incidents that the department's internal-affairs division was required to investigate. Pl.'s Ex. 15 (teletype dated July 3, 2014). Under the teletype, internal affairs was not required to investigate all incidents in which officers used force, but only certain categories of incidents, including "serious" uses of force that resulted in "admission to a hospital," "broken bones," "loss of consciousness," or risk of death or serious bodily injury. *Id.* at 3. Another teletype, dated July 29, 2014, restricted the circumstances requiring completion of a Use of Force Incident Report. Pl.'s Ex. 16 (teletype dated July 29, 2014). It provided that no such reports would be required for "contact controls," "unresisted handcuffing," "resisted handcuffing," or "solo or team takedowns," "unless there has been a resulting injury or complaint of pain." *Id.* In addition, officers were no longer required to notify their watch commanders of "contact controls or resisted handcuffing in which there was no report of injury or pain." *Id.*

Longo criticized these changes because uses of force like tactical takedowns always involve a "foreseeable risk someone's going to get hurt," and opined that it is important to document those incidents so that the District can "go back and make sure that those type of force decisions are being made appropriately." Defs.' Ex. 2 (Longo Dep.) at 54:13-18. In Longo's opinion, "when you adopt a policy that lessens your ability to adequately investigate things like

force, that's a de facto policy that you've adopted that could lead to a foreseeable risk of harm." *Id.* at 63:2-7.  Longo also opined that "it was generally accepted practice to at least document and do some form of investigation with respect to [tactical takedowns]."  *Id.* at 56:18-20. However, his opinion was not that "every tactical takedown should go to [internal affairs]."  *Id.* at 57:18-20.

Notwithstanding these criticisms, Longo concluded that the District's written "policies and procedures . . . pertaining to the use of force and how such force is reported and investigated . . . are consistent with generally accepted policing practices."  Longo Supp. Rep. at 9.  He further concluded, however, that after the MOA ended the District permitted "a de facto policy, or wide spread custom, or practice that impeded the rigorous, thorough, and timely investigation of use of force incidents."  *Id.* at 17.  He based this conclusion to a significant degree on his review of several administrative case files provided by Jackson's counsel, six of which involved use of force.  *See id.* at 15.  He identified several deficiencies:

- Only one of the case files included audio-recorded statements, which Longo believes are required by best practices in internal police investigations.  *Id.* at 13, 15.

- In each case file "investigated by district personnel," the involved officers received "reverse *Garrity*" warnings.  *Id.* at 15.[4]  In Longo's view, the "blanket use . . . of the *Garrity* admonishment" where it is not required unduly delays internal police investigations.  Longo Supp. Rep. at 14.

- In one case in which Sergeant Harrison was accused of kicking a suspect, the case file was "void of any statements from the involved officers or any

---

[4] A "*Garrity* warning," named for *Garrity v. New Jersey*, 385 U.S. 493 (1967), advises government employees under investigation that they may remain silent, that they will not be fired solely because they exercise their right to remain silent, and that any statements they make can be used in a criminal proceeding.  *See, e.g.*, *United States v. Palmquist*, 712 F.3d 640, 644 (6th Cir. 2013) (example of *Garrity* warning).  A "reverse *Garrity*" warning, by contrast, advises employees that they *are* required to speak to investigators, that they may face adverse employment consequences for anything they say, but that their statement will *not* be used against them in a criminal case.  *See United States v. Anderson*, 450 A.2d 446, 449 n.1 (D.C. 1982).

potential witnesses." *Id.* at 15. The matter was referred to the U.S. Attorney's Office, which declined to prosecute. *Id.*

- Another case involved an accusation of excessive force against Officer Smith and other officers. *Id.* In that case, the "only real investigation" consisted of phone interviews with two of the involved officers. *Id.*

In addition, Longo noted, the 2016 Bromwich report reviewed 32 use-of-force investigations and concluded that four of those cases (12.5%) should have been, but were not, investigated by internal affairs. *Id.* at 16; Pl.'s Ex. 13 (2016 Bromwich report) at 42. The Bromwich Group also identified other deficiencies, including a general failure to engage in "tactical analysis" or make "recommendations for remediation." Longo Supp. Rep. at 16.

Longo also heavily criticized the investigation into the use of force against Jackson, which he described as "woefully deficient." *Id.* at 18. In his view, internal affairs should have investigated the matter because Jackson was hospitalized. Defs.' Ex. 2 (Longo Dep.) at 63:17-22; Longo Supp. Rep. at 11. On this point, the District's Rule 30(b)(6) witness seemed to agree with Longo, testifying that any use of force that results in hospitalization or a broken bone "is an obvious [internal affairs] case." Pl.'s Ex. 17 (Power Dep.) at 73:5-11. Longo also concluded that Harrison failed to properly "canvass" the crime scene for additional witnesses, although police records indicated that a canvass did in fact occur. Longo Supp. Rep. at 12 & n.55. Harrison at least attempted to interview all the non-police witnesses known to have been on the scene of the arrest: he spoke to Jackson, Jones (who claimed to have slept through the encounter), and Jones's female companion (who declined to give a statement). *See id.* at 7-8. But Longo faults Harrison for failing to tape-record the statements he received and to create a "step by step" chronology of his investigation. *Id.* at 12-13. And while a police lieutenant did ultimately write an investigative report on the incident, Longo concluded that this investigation was inadequate because it was completed two months after the incident. *See id.* at 7, 12.

Based on these examples and the post-MOA policy changes, Longo concluded that the District had a de facto policy of tolerating inadequate use-of-force investigations. *Id.* at 17. He further opined that this de facto policy was the "moving force" behind Jackson's injuries. *Id.*; Defs.' Ex. 2 (Longo Dep.) at 45:11-20. He acknowledged that this conclusion might seem counterintuitive, given that Jackson's case was in fact investigated. *See* Longo Supp. Rep. at 11. He nonetheless opined that deficiencies in the District's investigative practices "allow[] for the grave possibility that misconduct will take place with impunity" and "that officers will use force that exceeds policy, knowing that they will have sufficient time in which to formulate an account that will either justify or mitigate their actions, and further knowing that whatever account is offered[,] they may in all likelihood go unchallenged and not be subject to greater security." *Id.* at 18.

### C.    Procedural History

Jackson filed this case on December 23, 2015. His complaint contains five counts: a Fourth Amendment claim under 42 U.S.C. § 1983 against the individual officers (Count I), a Fifth Amendment claim under § 1983 against the individual officers (Count II), a common law assault and battery claim against the individual officers and the District (Count III), a common law intentional infliction of emotional distress claim against the individual officers and the District (Count IV), and a Fourth Amendment claim against the District on a theory of municipal liability under § 1983 (Count V). After discovery closed, Defendants filed the instant motion. ECF No. 35. Discovery was reopened for a short period after briefing on the motion was completed. *See* Minute Order of October 13, 2017. However, discovery closed definitively in November 2017, and neither party has sought to supplement the record since then.

## II.     Legal Standard

With respect to Jackson's Fifth Amendment claim, Jackson has chosen to oppose the motion by relying solely on the allegations in his complaint.  *See* Pl.'s Opp'n at 3-7.  Therefore, the Court will treat this part of the motion as one for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) and exclude all matters outside the pleadings when considering it. *See* Fed. R. Civ. P. 12(d).  "[A] Rule 12(c) motion . . . is functionally equivalent to a Rule 12(b)(6) motion."  *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 130 (D.C. Cir. 2012).  "In considering a motion for judgment on the pleadings, the Court should 'accept as true the allegations in the opponent's pleadings' and 'accord the benefit of all reasonable inferences to the non-moving party.'"  *Stewart v. Evans*, 275 F.3d 1126, 1132 (D.C. Cir. 2002) (quoting *Haynesworth v. Miller*, 820 F.2d 1245, 1249 n.11 (D.C. Cir. 1987)).

With respect to the other claims, the Court will treat the motion as one for summary judgment under Federal Rule of Civil Procedure 56, because discovery has closed and the parties have attached the relevant parts of the record to their motion papers.  Under Rule 56, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "Summary judgment is appropriately granted when, viewing the evidence in the light most favorable to the non-movants and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in their favor."  *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016).  Courts "are not to make credibility determinations or weigh the evidence."  *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Id.* (alteration in original) (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). "The movant bears the initial burden of demonstrating that there is no genuine issue of material fact." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017). "In response, the non-movant must identify specific facts in the record to demonstrate the existence of a genuine issue." *Id.*

## III. Analysis

As explained below, the Court will grant Defendants' motion in part and deny it in part. The Court will dismiss Count II, the Fifth Amendment excessive-force claim, because that claim must be analyzed under the Fourth Amendment and thus is duplicative of Count I. The Court will also enter summary judgment for Harrison on all claims, for Smith and Bolton on Count IV (intentional infliction of emotional distress), and for the District on Count V (which asserts municipal liability under 42 U.S.C. § 1983). The motion will otherwise be denied.

### A. Count II: Fifth Amendment

Defendants argue that the Fifth Amendment claim "merges" with the Fourth Amendment claim and thus should be dismissed. Defs.' Br. at 7-8. The Court agrees. "*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Here, Jackson's claim is that officers used excessive force during the traffic stop and subsequent arrest. *See* Compl. ¶¶ 34-40. That conduct plainly falls within the Fourth Amendment claim in Count I, and thus he cannot bring a duplicative Fifth Amendment claim based on the same conduct.

Jackson argues for a contrary result. *See* Pl.'s Opp'n at 3-4. But the case he principally relies on, *Moore v. District of Columbia*, 79 F. Supp. 3d 121 (D.D.C. 2015), is inapposite. It concerned an altercation between two polices officers on one side, and a young man and his

mother on the other.  *See id.* at 124-26.  The Court allowed the Fifth Amendment claim to

proceed only against the mother, who was never arrested or subjected to an investigatory stop.

*See id.* at 129-30 & nn.10-12.  *Moore* is clearly distinguishable from this case, in which Jackson

was stopped and arrested.  Therefore, the Fifth Amendment claim must be dismissed against

all Defendants.

### B.    Count I: Fourth Amendment

Jackson does not dispute that officers had probable cause to arrest him, but claims that

the officers used excessive force to effect the arrest.  *See* Compl. ¶¶ 28-33.  "The Fourth

Amendment's prohibition on unreasonable seizures extends to an officer's use of excessive force

to conduct an arrest."  *Hedgpeth v. Rahim*, 893 F.3d 802, 809 (D.C. Cir. 2018).  "An officer may

'use some degree of physical coercion' or threat to arrest a suspect," even if the force used might

appear unnecessary in hindsight.  *Id.* (quoting *Oberwetter v. Hilliard*, 639 F.3d 545, 555 (D.C.

Cir. 2011)).  Whether a particular use of force is excessive depends on the facts of the case,

"including the severity of the crime at issue, whether the suspect poses an immediate threat to the

safety of the officers or others, and whether he is actively resisting arrest or attempting to evade

arrest by flight."  *Id.* (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)).  Because this

claim is brought under 42 U.S.C. § 1983, Jackson must show that "each Government-official

defendant, through the official's own individual actions, has violated the Constitution."  *Ashcroft

v. Iqbal*, 556 U.S. 662, 676 (2009).

Defendants seek judgment in favor of Officers Bolton, Smith, Braithwaite, Hillgren and

Harrison on the Fourth Amendment Claim.  Defendants argue that none of these officers

participated in the alleged use of excessive force against Jackson.  Defs.' Br. at 8-9.  Jackson

argues, however, that each of these Defendants was personally involved in the alleged

constitutional violation, and alternatively that each is liable under a theory of "bystander liability." Pl.'s Opp'n at 8-11.

Based on the record before it, the Court agrees with Defendants that there is no evidence to support this claim against Harrison, but will allow the claim to proceed against the other individual Defendants.

### 1. Braithwaite and Hillgren

Genuine issues of material fact preclude summary judgment in favor of Braithwaite and Hillgren. Jackson testified at his deposition that both officers participated in the use of excessive force against him. According to Jackson, the officers beat him for no reason as he lay subdued on the ground, trying to shield himself from the blows. Pl.'s Ex. 1 (Jackson Dep.) at 50:17-51:11. Obviously, a jury could find that this constituted excessive force. *See Harris v. U.S. Dep't of Veterans Affairs*, 776 F.3d 907, 913-15 (D.C. Cir. 2015); *Pershell v. Cook*, 430 F. App'x 410, 415 (6th Cir. 2011). Jackson further testified that, although blinded by pepper spray, he could identify the officers based on touch and the sound of their voices. He could, in his telling, feel the "presence" of a female officer among those beating him and, based on the height of the officer, identified her as Hillgren from among the three female officers on the scene (Bolton, Smith and Hillgren). Pl.'s Ex. 1 (Jackson Dep.) at 162:13-163:2. He also testified that he recognized Braithwaite as one of his attackers when Braithwaite accompanied him in the ambulance: "I realized when I heard his voice that he was one of the officers that was beating me." *Id.* at 59:4-7. Therefore, the Fourth Amendment claim against Braithwaite and Hillgren may proceed.

### 2. Bolton and Smith

Defendants' motion is a closer call as it pertains to Bolton and Smith. The evidence against these two officers is unusual. Jackson's own testimony states that Bolton and Smith did

not themselves use excessive force against him. Nonetheless, he claims in his briefing that other evidence (including Smith's testimony) establishes that these two officers did, in fact, participate in the use of excessive force. *See* Pl.'s Opp'n at 10. In any event, Jackson argues, they should be subject to bystander liability. *See id.* at 9-10. The Court concludes that the record, viewed as a whole, creates genuine issues of material fact regarding Bolton's and Smith's liability for the asserted use of excessive force.

As noted, Jackson's own testimony is relatively favorable to Bolton and Smith. Jackson testified that Bolton had not used any force against him; his claim against her is that "[s]he didn't stop the assault." *Id.* at 162:5-7; *see id.* at 161:9-162:12. Smith's only use of force in Jackson's account was to handcuff him, *see id.* at 45:2-18, 161:1-13, which was not excessive, given that Jackson does not allege that the handcuffs were too tight or otherwise improperly applied. *Compare Garay v. Liriano*, 943 F. Supp. 2d 1, 21 (D.D.C. 2013) (routine handcuffing during arrest not excessive force), *with Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 22-24 (D.D.C. 2011) (allowing excessive force claim to proceed based on allegation that officer refused to loosen unreasonably tight handcuffs despite arrestee's complaints of pain). In fact, Smith seems to have helped Jackson. In Jackson's telling, when Bolton and Smith arrived to find Merzig and Fogle mistreating him, Smith tried to intervene, asking, "Hey, what are you guys doing to him?" Pl.'s Ex. 1 (Jackson Dep.) at 43:15-19. "At that point, everything stopped. They stopped pulling, they stopped tussling, and everything." *Id.* at 43:20-22. Summing up, Jackson testified that Smith was "the only one, in my opinion, that I believe tried to help me." *Id.* at 163:21-22.

Other evidence, however, suggests that Bolton and Smith participated to a somewhat greater degree in the use of force against Jackson. Specifically, both Smith's testimony and

Bolton's written report say that they assisted in the "tactical takedown." *See* Pl.'s Ex. 3 (Smith Dep.) at 39:11-18; Pl.'s Ex. 4 (Bolton report) at 3 (explaining that "collectively we utilized a team takedown"). Smith expressly denied, however, that any officer threw a punch at Jackson during the takedown. Pl.'s Ex. 3 (Smith Dep.) at 40:7-17.

It is a close question whether Bolton and Smith's involvement in the takedown, on its own, would be enough to raise a genuine issue of material fact about their use of excessive force. In this Circuit and elsewhere, courts have generally upheld the use of "takedowns" or "leg sweeps" as a lawful police maneuver to subdue suspects who are resisting arrest. *See Huntley v. City of Owasso*, 497 F. App'x 826, 832 (10th Cir. 2012); *Blacknall v. Citarella*, 168 F. App'x 489, 491 (3d Cir. 2006) (per curiam); *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 87-88 (D.D.C. 2015). The D.C. Circuit itself recently held, in a case where officers used a tactical takedown on a plaintiff who was resisting arrest, that the officers enjoyed qualified immunity. *See Hedgpeth*, 893 F.3d at 808-11.[5] In contrast, courts have denied summary judgment in cases regarding "leg sweeps" where suspects claimed not to have resisted arrest. *See Smith v. City of Troy*, 874 F.3d 938, 944-45 (6th Cir. 2017); *Montoya v. City of Flandreau*, 669 F.3d 867, 871-72 (8th Cir. 2012). The Ninth Circuit has allowed such a claim to go to a jury where the plaintiff put up only minimal resistance. *See Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1116-17 (9th Cir. 2017).

Here, the parties dispute whether Jackson was resisting arrest: Jackson claims he consistently tried to comply with the officers' commands, *see* Pl.'s Ex. 1 (Jackson Dep.) at 41:18-42:16, 44:9-16, 51:22-53:22, while the officers claim that Jackson persistently resisted efforts to handcuff him, *see* Pl.'s Ex. 3 (Smith Dep.) at 28:8-29:5, 31:2-14, 36:16-21; Pl.'s Ex. 4

---

[5] For whatever reason, Defendants have not raised qualified immunity in their motion.

(Bolton report) at 3. This suggests a genuine issue of material fact regarding whether the takedown amounted to excessive force. To be sure, Jackson's case is made more difficult by the fact that he was subsequently convicted of assaulting a police officer and attempting to flee a police officer. Compl. ¶ 23. However, Defendants have not argued that these convictions have preclusive effect in establishing that Jackson was resisting arrest. Nor have they introduced into the record any information about the findings of fact underlying the convictions. Thus, on the record before the Court, it is unclear whether the convictions conclusively establish that Jackson was resisting the officers at the time the takedown occurred; it is possible, for instance, that those convictions are based on Jackson's conduct during his initial interaction with Merzig and Fogle, and that he became compliant later in the encounter, before the officers took him to the ground.

Regardless of whether Smith and Bolton personally used an unlawful degree of force against Jackson, the evidence more clearly raises a genuine issue of material fact about whether Smith and Bolton may be subject to "bystander liability" for the use of force that, in Jackson's account, occurred after they arrived on the scene.[6] Courts of appeals outside this Circuit have authorized liability for "police officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's rights through the use of excessive force but fail to do so." *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000); *see Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43, 50-53 (1st Cir. 2005); *Figueroa v. Mazza*, 825 F.3d 89, 106-08 (2d Cir. 2016); *Garbacik v. Janson*, 111 F. App'x 91, 94 (3d Cir. 2004); *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416-17 (4th Cir. 2014); *Hamilton v. Kindred*, 845 F.3d 659, 663-64 (5th

---

[6] They may not, of course, be held liable as bystanders for any use of force by Merzig and Fogle before they arrived, particularly in light of Jackson's testimony that Smith put a stop to Merzig and Fogle's mistreatment of Jackson upon arrival. *See Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018) (explaining there is no bystander liability where officer intervenes to help suspect).

Cir. 2017); *Smoak v. Hall*, 460 F.3d 768, 784 (6th Cir. 2006); *Livers v. Schenck*, 700 F.3d 340, 360 (8th Cir. 2012); *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir. 2000); *Estate of Booker v. Gomez*, 745 F.3d 405, 422-23 (10th Cir. 2014); *Hadley v. Gutierrez*, 526 F.3d 1324, 1330-31 (11th Cir. 2008). This liability has been justified on the theories that an officer has an affirmative duty to intervene to prevent another officer's use of excessive force, *see Livers*, 700 F.3d at 360; that an officer may become a "tacit collaborator" by failing to intervene, *see Figueroa*, 825 F.3d at 107-08; and that failure to intervene may amount to deliberate or reckless disregard of the plaintiff's constitutional rights, *see Miller*, 220 F.3d at 495.

Courts in this District have borrowed the Fourth Circuit's test for such "bystander liability," holding an officer liable "if he: (1) knows that a fellow officer is violating an individual's constitutional right; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Fernandors v. District of Columbia*, 382 F. Supp. 2d 63, 72 (D.D.C. 2005) (citing *Randall v. Prince George's Cty.*, 302 F.3d 188, 204 (4th Cir. 2002)). Viewing the record in this case as a whole, the Court concludes that there is a genuine issue of material fact regarding whether Bolton's and Smith's conduct satisfies this test. In Jackson's account, the other officers punched and kicked him repeatedly even as he lay on the ground with his hands pinned beneath his body, after Smith and Bolton had arrived on the scene. *See* Pl.'s Ex. 1 (Jackson Dep.) at 47:19-48:1, 50:16-51:2. And Jackson testified that Smith successfully halted Merzig and Fogle's alleged assault when she arrived, *see id.* at 43:14-22, 163:21-22, from which one could infer that Smith or Bolton could also have stopped the alleged subsequent assault by speaking up.[7] Moreover, as explained above, Bolton and Smith participated in the tactical

---

[7] Arguably, Smith's ability to intervene would have been affected by the fact that some of the pepper spray aimed at Jackson affected her as well. *See* Pl.'s Ex. 1 (Jackson Dep.) at 46:19-47:2;

takedown, from which one could infer that they approved of the other officers' alleged use of force as well. Therefore, the Fourth Amendment claim may proceed against Smith and Bolton on a theory of bystander liability, at the very least.

### 3. Harrison

Jackson has failed, however, to create a genuine issue of material fact supporting Harrison's liability. By Jackson's own admission, Harrison arrived on the scene after the alleged excessive force occurred and had no contact with Jackson. *See* Pl.'s Opp'n at 10-11. Rather, Jackson's theory is that Harrison should be held liable because he conducted the police department's initial investigation into the officers' use of force. *See id.* But Jackson's theory makes no sense. His Fourth Amendment claim against the officers is for use of excessive force, not for failure to conduct a proper investigation into the use of excessive force. *See* Compl. ¶¶ 28-33. And Harrison cannot be held liable as a "bystander," because officers arriving on the scene after a constitutional violation has occurred obviously do not have a reasonable opportunity to prevent the violation from occurring. *See, e.g.*, *Smith v. Ray*, 409 F. App'x 641, 649 (4th Cir. 2011); *Ibarra v. Harris Cty.*, 243 F. App'x 830, 835 n.8 (5th Cir. 2007); *Mazloum v. District of Columbia*, 442 F. Supp. 2d 1, 6-7 (D.D.C. 2006).

Jackson cites the D.C. Circuit's opinion in *Wesby v. District of Columbia*, 765 F.3d 13 (D.C. Cir. 2014), *rev'd*, 138 S. Ct. 577 (2018), for the proposition that Harrison can be held liable for his failure to adequately investigate Jackson's injuries. Pl.'s Opp'n at 10. However, since the briefing in this case was completed, the Circuit's decision in *Wesby* has been reversed.

---

Pl.'s Ex. 3 (Smith Dep.) at 32:17-22. However, Smith described this as only a "light mist" that did not require medical treatment, Pl.'s Ex. 3 (Smith Dep.) at 32:20-22, and it apparently did not prevent her from participating in the tactical takedown, *see id.* at 39:14-18. Therefore, the Court cannot conclude on the record before it that the pepper spray deprived Smith of a reasonable opportunity to stop the alleged battery of Jackson.

Regardless, the Circuit's opinion offers no help to Jackson. That case concerned an alleged false arrest without probable cause, and the Circuit held that officers who played a role in the allegedly defective investigation that led to the arrest could be held liable under § 1983. *Wesby*, 765 F.3d at 29-30. Here, there is no evidence or allegation that Harrison was involved in any of the events leading up to the asserted use of excessive force. Therefore, the Court must grant summary judgment in Harrison's favor on Count I.

### C.      Count III: Assault and Battery

Assault and battery are two related but "conceptually distinct" torts under District of Columbia law. *District of Columbia v. Chinn*, 839 A.2d 701, 706 n.2 (D.C. 2003). "[A] plaintiff can recover for assault by proving [an] 'intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the plaintiff,' and for battery by proving an 'intentional act that causes harmful or offensive bodily contact.'" *Id.* at 705 (quoting *Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C. 1997)). "Strictly speaking, a police officer effecting an arrest commits a battery. If the officer does not use force beyond that which the officer reasonably believes is necessary, given the conditions apparent to the officer at the time of the arrest, he is clothed with privilege." *Id.* at 706. "This standard is similar to the excessive force standard applied in the Section 1983 context." *Dormu*, 795 F. Supp. 2d at 28 (quoting *Rogala v. District of Columbia*, 161 F.3d 44, 57 (D.C. Cir. 1998)). As under the Fourth Amendment, the "reasonableness of a particular [use] of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20-20 vision of hindsight." *Chinn*, 839 A.2d at 706 (quoting *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993) (quoting *Graham*, 490 U.S. at 396)). "[L]iability is imposed only for the harm done by the use of such force as was excessive, unless the harm cannot be differentiated." *Id.*

Defendants move for summary judgment on Count III, common law assault and battery, on the same ground as Count II: that Bolton, Smith, Braithwaite, Hillgren and Harrison did not participate in the alleged use of excessive force against Jackson. *See* Defs.' Br. at 8-9. The Court will deny the motion as to Braithwaite and Hillgren, and grant it as to Harrison, for the same reasons set forth above: there is evidence that Braithwaite and Hillgren participated in the alleged beating of Jackson, while it is undisputed that Harrison was not even present for it.

Once again, this claim is a closer call with respect to Bolton and Smith. Unlike on the § 1983 claim, Jackson can hold Bolton and Smith liable on this claim only to the extent they personally exercised force against him. To hold one defendant liable for a battery committed by another, the plaintiff must show some basis for vicarious liability under the common law, such as aiding and abetting or conspiracy. *See Rawlings v. District of Columbia*, 820 F. Supp. 2d 92, 107-08 (D.D.C. 2011) (explaining that the defendant's "presence at the shooting, without more, cannot render him liable for assault and battery"). Common law theories of vicarious liability are not identical to "bystander liability" under § 1983. For example, in *Ingram v. Shipman-Meyer*, 241 F. Supp. 3d 124 (D.D.C. 2017), the court found a genuine existence of material fact going to three defendants' potential bystander liability under § 1983, but granted summary judgment for those three defendants on the issue of aiding-and-abetting liability under the common law. *See id.* at 147-49. Here, Jackson has not pleaded any theory of common law vicarious liability for the individual defendants in his complaint, or argued for one in his briefing. *See* Compl. ¶¶ 41-45; Pl.'s Opp'n at 11-13. Therefore, the Court must consider whether Bolton's and Smith's individual actions constituted excessive force.

As already explained, the record shows that Bolton and Smith personally used only two forms of force against Jackson: the handcuffing and the tactical takedown. Handcuffing a

suspect during a lawful arrest, without more, is not excessive force. *Garay*, 943 F. Supp. 2d at 21. The question is therefore whether the tactical takedown constituted excessive force under District of Columbia law. As discussed above, District of Columbia law tends to follow federal law on the issue of excessive force, and several Fourth Amendment cases dealing with "leg sweeps" and tactical takedowns have found them to be excessive where the plaintiff was not actively resisting arrest. *See supra* p. 17.

The case of *Kotsch v. District of Columbia*, 924 A.2d 1040 (D.C. 2007), is also instructive. There, the plaintiff was arrested in a restaurant by two off-duty police officers working as private security guards. *Id.* at 1042. In his version of events, he got into a brief verbal spat with the officers after they ordered him to pick up trash he had dropped on the floor, prompting the officers to charge at him, strike him with their batons, and drag him outside. *Id.* at 1042-43, 1048. In the officers' version of events, they had valid grounds for an arrest and, when the plaintiff tried to run, pushed him against a wall in order to handcuff him. *Id.* at 1043-44. The court concluded that a genuine issue of material fact precluded summary judgment, because the charges were minor (and ultimately dropped) and the parties disputed the amount of force used, whether the plaintiff had resisted arrest, and the extent of the plaintiff's injuries. *Id.* at 1050; *see also Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 863-64 (D.C. 1982) (upholding a jury verdict for the plaintiff on assault and battery where a security guard employed by the defendant grocery store "grabbed [the plaintiff] from behind around the throat and pushed him to the ground before handcuffing him," even though the plaintiff "offered no resistance").

The Court concludes that, as in *Kotsch*, the parties' radically different versions of events prevent summary judgment on this claim. As discussed above, in Jackson's account, he persistently attempted to cooperate with the officers, who nonetheless greeted him with violence.

He also claims that, during the takedown, he was "slammed face-forward down towards the ground." Pl.'s Ex. 1 (Jackson Dep.) at 50:14-15. It is not the Court's role on this motion to judge Jackson's credibility. Based on Jackson's testimony, a reasonable jury could conclude that the takedown went beyond what any officer could reasonably believe was necessary and thus was not privileged. Therefore, this claim may proceed against Bolton and Smith.

### D. Count IV: Intentional Infliction of Emotional Distress

"Establishing a prima facie case of intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 995 (D.C. Cir. 2014) (quoting *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003)). "The conduct alleged must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991)). Under District of Columbia law, "'a serious case of excessive force' can constitute outrageous behavior such that it satisfies a claim of intentional infliction of emotional distress." *Harris*, 776 F.3d at 917 (quoting *Gabrou v. May Dep't Stores Co.*, 462 A.2d 1102, 1105 (D.C. 1983)).

Once again, Defendants have moved to dismiss on the ground that Bolton, Smith, Braithwaite, Hillgren and Harrison did not themselves use force against Jackson. Defs.' Br. at 9-10. The Court will deny the motion as to Braithwaite and Hillgren on this claim because Jackson has testified that they beat him as he lay helpless on the ground, which if true could constitute outrageous conduct. *See Harris*, 776 F.3d at 917. The Court will grant the motion as to Harrison, because he was not there when the alleged beating occurred.

The Court will also grant Bolton and Smith summary judgment on this claim. Once again, Jackson has neither pleaded nor argued any basis for imputing the other officers' conduct to Bolton and Smith under the common law. *See* Compl. ¶¶ 46-51; Pl.'s Opp'n at 13-16. Nor has Jackson established that Bolton and Smith personally engaged in extreme and outrageous conduct. Only a "'*serious* case of excessive force'" can amount to actionable "outrageous behavior." *Harris*, 776 F.3d at 917 (emphasis added) (quoting *Gabrou*, 462 A.2d at 1105). Something more than a run-of-the-mill excessive-force claim is required. *Compare Hall v. District of Columbia*, 73 F. Supp. 3d 116, 121 (D.D.C. 2014) (dismissing emotional-distress claim against officer, but allowing assault and battery claim to proceed, where plaintiff sustained a broken wrist while being handcuffed), *and Smith v. District of Columbia*, 882 A.2d 778, 790-94 (D.C. 2005) (same result where officer choked plaintiff and broke his jaw), *with Harris*, 776 F.3d at 917 (permitting emotional-distress claim where plaintiff was arrested at a group-therapy session and, while restrained, punched so hard as to break his rib), *Greene v. Shegan*, 123 F. Supp. 3d 88, 91-93 (D.D.C. 2015) (same result where white officer arrested black off-duty police officer innocent of any crime, told him to "get the f* * * out of the street," dismissed black witnesses who identified him as a police officer, and allowed other officers to insult him), *and Daniels v. District of Columbia*, 894 F. Supp. 2d 61, 68 (D.D.C. 2012) (same result where officers unnecessarily manhandled plaintiff during her arrest and, when informed she was pregnant, responded, "who cares bitch").

The tactical takedown the officers used does not fit the bill. As the evidence in this case shows, it is a standard police maneuver. Moreover, the Court cannot ignore that Jackson resisted the officers at some point during the encounter—he was convicted of assaulting a police officer and attempting to flee a police officer. Compl. ¶ 23. Nor can it ignore the undisputed fact that

Jackson was extremely intoxicated. *See* Pl.'s Ex. 1 (Jackson Dep.) at 154:10-17; Pl.'s Ex. 2 (medical personnel's testimony) at 53:24-54:12; Pl.'s Ex 7 (Harrison Dep.) at 38:4-39:7. Reviewed as a whole, the record simply cannot support the conclusion that the tactical takedown, in and of itself, was such a serious deviation from normal standards of decency that it could constitute extreme and outrageous conduct. Because the takedown (in addition to handcuffing) is the only force Smith and Bolton can be shown to have used themselves, the intentional infliction of emotional distress claim cannot proceed against them.

In their reply, Defendants raise another basis for dismissing this claim: that Jackson has not introduced properly authenticated medical evidence to support it. *See* Defs.' Reply at 7-8. "[I]t is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief." *Benton v. Laborers' Joint Training Fund*, 121 F. Supp. 3d 41, 51 (D.D.C. 2015) (quoting *Lewis v. District of Columbia*, 791 F. Supp. 2d 136, 140 n.4 (D.D.C. 2011)). One of the reasons for this rule is to avoid unfair surprise to the other party. *See Bancoult v. McNamara*, 214 F.R.D. 5, 12 n.7 (D.D.C. 2003). Here, the risk of unfair surprise is palpable. It was hardly unexpected that Jackson would not have attached authenticated medical evidence to his opposition: Defendants' opening brief never challenged the medical basis for this claim, but merely argued that these five individual defendants had not participated in any outrageous conduct. *See* Defs.' Br. at 10. Accordingly, the Court will not consider this argument.

### E. Count V: Municipal Liability

"It is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1951 (2018) (quoting *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 691 (1978)). The D.C. Circuit has

explained that "[t]here are a number of ways in which a 'policy' can be set by a municipality to cause it to be liable under § 1983":

> [1] the explicit setting of a policy by the government that violates the Constitution; [2] the action of a policy maker within the government; [3] the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become "custom"; or [4] the failure of the government to respond to a need (for example, training of employees) in such a manner as to show "deliberate indifference" to the risk that not addressing the need will result in constitutional violations.

*Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citations omitted).

Jackson has tried, but failed, to invoke ways (1) through (3) to show a policy or custom regarding officers' use of excessive force in the District. His expert witness, Longo, concluded that the District's written policies on use of force comported with "generally accepted policing practices." Longo Supp. Rep. at 9. Reviewing statistical evidence in the police department's annual reports, Longo found "complaints of excessive force to be a relatively small number of the total complaints received over a given year." *Id.* at 16. Thus, based on the information available to him, Longo was unable to render any opinion on whether the District had a "de facto policy, wide spread custom, or practice of excessive use of force." *Id.* at 17.

Jackson therefore relies solely on way (4), arguing that the District had a practice of inadequately *investigating* police officers' use of force. *See* Pl's Opp'n at 16-23. In order for this theory to be actionable, Jackson must establish two things. First, he must show that the District's practices regarding use-of-force investigations amounted to deliberate indifference toward the risk that police officers would use excessive force. *See Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997). He must also establish causation: that these practices were the "moving force" behind the injuries he claims to have suffered on the night of May 4-5, 2015. *See id.* at 408. He has made neither showing.

1.      **Deliberate Indifference**

First, Jackson has not created a genuine issue of material fact regarding deliberate indifference.  "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Id.* at 410.  "A showing of simple or even heightened negligence will not suffice."  *Id.* at 407.  Jackson's evidence on this point is fatally flawed.  The Court assumes that Longo is right and that the District has deviated from best practices regarding use-of-force investigations since the MOA, both through its written policies and through its practices.  But it is not enough to show simply that the District fell short of best practices or failed to optimally reduce the risk of constitutional violations.  Jackson must show that the District, by tolerating defective use-of-force investigations, effectively turned a blind eye to an obvious risk that those practices would result in officers' use of excessive force.

In cases involving an alleged failure to train or supervise employees, there are two ways to prove up deliberate indifference.  The more common way is to show a "pattern of similar constitutional violations" that have gone unaddressed.  *Connick v. Thompson*, 563 U.S. 51, 62 (2011).  Jackson has not done so.  The only constitutional violation he has alleged is his own.  The Court notes that Longo's report points to a handful of other cases that involved the use of force, but Longo did not opine that any constitutional violations occurred in those cases, only that the investigations were inadequate.  *See* Longo Supp. Rep. at 15-16.

In a case involving a single constitutional violation, the plaintiff must show that the municipality's oversight was so severely inadequate as to make it "obvious" that similar violations would result.  *Connick*, 563 U.S. at 63.  Instances of excessive force would be obviously foreseeable if, for example, a city utterly failed to train its armed police officers on when to use deadly force.  *See id.* at 63-64 (citing *City of Canton v. Harris*, 489 U.S. 378, 390

n.10 (1989)).  Only a rank abdication of a municipality's duty to investigate police misconduct can meet this test.  *See Parker v. District of Columbia*, 850 F.2d 708, 712 (D.C. Cir. 1988) (requiring a showing of "systemic and grossly inadequate training, discipline and supervision").  For example, in *Cox v. District of Columbia*, 821 F. Supp. 1 (D.D.C. 1993), *aff'd*, 40 F.3d 475 (D.C. Cir. 1994), the court found that the District's woefully understaffed and underfunded Civilian Complaint Review Board had failed to investigate hundreds (and perhaps well over a thousand) of excessive-force cases, such that the District's investigatory system amounted to a "nullity."  *See id.* at 5-9, 11-17.  A smaller-scale example can be found in *Vineyard v. County of Murray*, 990 F.2d 1207 (11th Cir. 1993), where a sheriff's department had no written policies on use of force and allowed deputies accused of misconduct to investigate themselves.  *Id.* at 1212.

In contrast, a city's mere failure to adopt "best practices" in use-of-force investigations is not enough to excuse plaintiffs from showing that the city recklessly ignored a pattern of constitutional violations.  *See Westfahl v. District of Columbia*, 75 F. Supp. 3d 365, 377-78 (D.D.C. 2014); *cf. Buckler v. Israel*, 680 F. App'x 831, 836 (11th Cir. 2017) (rejecting argument that failure to adopt "best practices" amounted to deliberate indifference).  In *Westfahl*, for example, the plaintiff claimed that the District had failed to adequately fund use-of-force investigations, to adequately document uses of force, and to fire officers who used excessive force.  75 F. Supp. 3d at 377-78.  The court found this evidence insufficient in the context of the District's undisputed efforts to reduce the incidence of excessive force.  *See id.* at 378.  The plaintiff, the court concluded, "has not demonstrated how the problems he raises reflect a policy of tolerance of excessive force as opposed to genuine, although perhaps not always successful, efforts to grapple with the types of problems to be expected in any large metropolitan police department."  *Id.*

The same can be said in this case.  Notwithstanding its disagreement with some of the District's practices, the 2016 Bromwich report concluded that the police department's staff "remains committed to limiting and managing use of force—and to fair and constitutional policing."  Pl.'s Ex. 13 at i.  Longo himself concluded that the District's written policies regarding use-of-force investigations are adequate.  Longo Supp. Rep. at 9.  This evidence—on which Jackson himself relies—hardly shows that the District is indifferent to excessive force.  It in fact establishes the opposite.

Longo tries to paint a dire picture of the District's practices based on a handful of investigations he believes were conducted improperly.  But these instances are "too scattered and lacking in detail to build a case" of deliberate indifference.  *Carter v. District of Columbia*, 795 F.2d 116, 124 (D.C. Cir. 1986).  And even taken on their own terms, the examples do not show indifference to constitutional violations.  In Jackson's case, an investigation was in fact performed and a written report completed, albeit imperfectly in Longo's opinion.  *See* Longo Supp. Rep. at 7, 11.  In one of the other instances Longo cites, the U.S. Attorney's Office reviewed the matter and declined to prosecute.  *Id.* at 15.  It is hard to see how the District could have been "indifferent" to matters it in fact investigated in this manner.

Jackson also seeks to draw an inference of deliberate indifference from the fact the District relaxed its policies regarding use-of-force investigations just after the MOA ended.  Pl.'s Opp'n at 21-22.  He argues that this shows a desire to return to the District's earlier, "systematically flawed" practices.  *Id.* at 22.  The undisputed evidence, however, shows that the District made these changes in order to concentrate its resources on more serious instances in which officers use force and on routine police work.  *See* Defs.' Ex. 2 (Longo Dep.) at 53:18-54:4; Longo Supp. Rep. at 10-11.  Neither Longo's report nor any other evidence suggests that

this justification was pretextual.  Longo describes this a "conscious and deliberate" decision—which it was, but only in the sense that the District consciously refused to maintain policies it thought unnecessary to prevent instances of excessive force.  *See* Longo Supp. Rep. at 17.  And that was entirely permissible: police departments must weigh what resources to put into investigating their own officers, knowing that those same resources could instead be put to use in fulfilling their primary mission of preventing crime in society at large.  The Constitution does not require a perfect balance between these two objectives; municipalities can violate it only when they overlook *obvious* deficiencies in their practices.  That simply is not the case here.

### 2.    Causation

Jackson has also failed to meet the causation requirement for municipal liability.  "A deliberately indifferent policy or custom is 'deemed to be the moving force of a constitutional injury if the conduct is a substantial factor in bringing about the harm.'"  *Smith v. District of Columbia*, 413 F.3d 86, 102 (D.C. Cir. 2005) (internal quotation marks omitted) (quoting *Parker*, 850 F.2d at 714).  This requirement is similar to proximate cause, in that it requires both factual causation (that the particular violation at issue would not have occurred but for the alleged policy) and foreseeability (that the violation was a foreseeable result of the policy).  *See id.* at 102-03.

Jackson complains that the District, after the MOA ended, improperly restricted the circumstances requiring specialized use-of-force reports and investigation by either internal affairs or a specialized investigative team.  *See* Pl.'s Opp'n at 17-18.  But the District's policies *did* require those measures in *his* case.  The police department required an internal-affairs investigation whenever the suspect suffered a broken bone or was hospitalized for his injuries.  *See* Pl.'s Ex. 15 (teletype of July 3, 2014) at 3; Pl.'s Ex. 17 (Power Dep.) at 73:7-11.  It also required a use-of-force report where a takedown resulted in "injury or complaint of pain."  Pl.'s

Ex. 16 (teletype of July 29, 2014).  Because Jackson broke his nose and required surgery and hospitalization for his injured neck, the District's policies required the very procedures Jackson claims were necessary.  These policies were followed to some extent in his case.  Bolton completed a "Use of Force Incident Report."  Pl.'s Ex. 4.  And an investigation was performed, if imperfectly and not by internal affairs.  *See* Longo Supp. Rep. at 11.[8]  Thus, even assuming that the District's policies could foreseeably have caused *some* instances of excessive force—namely, instances that do not result in a serious injury—Jackson has not shown these policies were a substantial factor in causing more serious injuries like the ones he suffered.

Longo opined that the causation requirement is satisfied on the following theory: the District tolerated "rudimentary" investigations into uses of force, which meant that officers knew that they could get away with using excessive force, which led to the beating that Jackson claims he suffered.  *See* Longo Supp. Rep. at 17-18.  On its own terms, this reasoning is far too speculative to satisfy the causation requirement for municipal liability under § 1983.

Expert testimony on causation can and should be excluded when it is based on speculation—that is, when there is an unacceptably large "gap" between the expert's data and his conclusion.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143-47 (1997) (discussing scientific expert testimony); *see also Phelan ex rel. Phelan v. Mullane*, 512 F. App'x 88, 93 (2d Cir. 2013) (holding social worker's expert testimony "too speculative to create a triable issue of fact on the issue of causation" needed for municipal liability); *Lane v. District of Columbia*, 72 F. Supp. 3d 215, 223-24 (D.D.C. 2014) (holding, notwithstanding expert's testimony, that "a reasonable jury could only speculate that the lack of some unspecified training contributed to [the plaintiff's

---

[8] There is also a suggestion in the record, not fully fleshed out, that an internal-affairs detective was contacted on the morning of May 5, 2015.  *See* Defs.' Ex. 2 (Longo Dep.) at 65:16-20.

son's] death"), *aff'd*, 887 F.3d 480 (D.C. Cir. 2018). For example, in *James v. Harris County*,
577 F.3d 612 (5th Cir. 2009), the Fifth Circuit considered an expert's opinion that an alleged
policy "only to cursorily investigate officer-involved shootings" had caused a particular police
shooting. *Id.* at 618. The court reasoned that causation could be established only if the officer
involved in the shooting had been aware of this policy. *Id.* It upheld the district court's decision
to partially exclude expert testimony grounded in the general proposition that "line officers tend
to break institutional rules if they are not enforced." *Id.* at 618-19. The expert reviewed 36 cases
involving police shootings, concluded that "a 'substantial number' fell below investigatory
standards," and opined that "informal networks of communication" would spread knowledge of
these inadequacies among lower-ranked officers. *Id.* The court concluded that this "general
testimony simply does not supply the direct causal link between the alleged policy and [the
officer's] alleged use of excessive force." *Id.* at 619.

Here, Longo has similarly failed to connect his musings to the facts of this case. The
only evidence Longo cited in favor of his causation theory was the handful of investigations that,
as discussed above, he believed were deficient. *See* Longo Supp. Rep. at 18.[9] He provided no
evidence and cited no studies linking these deficiencies to his assertion that officers might
brazenly use excessive force even in cases where the District's policies required a thorough
investigation. *See id.* at 18. Longo never even connected the dots of his own analysis. He
reasoned that "*if* officers have reason to believe their actions will go undetected," this "allows for

---

[9] Only one of the case files that Longo discusses involved an officer who participated in
Jackson's arrest. In it, a suspect was allegedly "thrown to the ground, handcuffed, and his back-
pack cut and removed from his shoulders" by Smith and two other officers. Longo Supp. Rep. at
15. But there is no indication that the suspect sustained any injuries (much less serious injuries
like the ones Jackson suffered). *See id.* There is also no indication whether that incident
occurred before or after Jackson's arrest, *see id.*, which is obviously a critical question going
to causation.

the grave *possibility* that misconduct will take place with impunity." *Id.* (emphases added). But he never found that District officers generally (much less the particular officers involved in this case) had reason to believe their actions would go undetected in cases involving *serious* uses of force. Based as it is on speculative and incomplete reasoning, Longo's opinion on causation cannot create a genuine issue of material fact.

For these reasons, the Court will grant summary judgment for the District on Count V.

## IV.    Conclusion and Order

For all of the above reasons, Defendants' Partial Motion for Judgment on the Pleadings and for Summary Judgment (ECF No. 35) is **GRANTED IN PART** and **DENIED IN PART**. Count II is **DISMISSED** against all Defendants. The Court **GRANTS** summary judgment in favor of Defendant Michael Harrison on all counts, in favor of Defendants Kanika Bolton and Carol Smith on Count IV, and in favor of the District of Columbia on Count V. The motion is otherwise **DENIED**. The Clerk of Court is directed to terminate Defendant Michael Harrison as a party.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: August 24, 2018