UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

ELIJAH JACKSON,

      *Plaintiff,*

v.

DISTRICT OF COLUMBIA, JOHN
MERZIG, MATTHEW FOGLE,
KANIKA BOLTON, CAROL SMITH,
ANTOINE BRAITHWAITE, and
LORELEI HILLGREN,

      *Defendants.*

Civil Action No. 1:15-cv-02247-TJK

---

## PLAINTIFF ELIJAH JACKSON'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS

NOW COMES Plaintiff Elijah Jackson ("Jackson"), by his attorneys, THE SULTON LAW FIRM LLC, by Attorney William F. Sulton ("Atty. Sulton"), and KINNER & MCGOWAN PLLC, by Attorneys Meredith L. Kinner and John T. McGowan, and submits the below memorandum in opposition to Defendants District of Columbia (the "District"), John Merzig ("Lt. Merzig"), Matthew Fogle ("Cpl. Fogle"), Kanika Bolton ("Ofc. Bolton"), and Carol Smith's ("Ofc. Scott") post-trial motions.  (Dkts. 153, 156.)

## I. INTRODUCTION



As shown in Plaintiff's Exhibits 2 and 3 above, Jackson suffered severe injuries following the arrest on May 5, 2015.  (Dkt. 159-2; Dkt. 159-3.)  Jackson testified that "Officer Merzig punched me repeatedly, beat me, almost broke my neck."  (Dkt. 158-2 at 72:20-73:2.)  Jackson testified that "Officer Fog[le] did the same."  (*Id.*)  And that "Officer Bolton and Officer Smith did not stop the assault." (*Id.*)  Jackson also testified that Cpl. Fogle sprayed Jackson in the face; that "[m]y eyes was burning, my nose [and] [t]he stuff had got into my throat"; that "I was repeatedly punched"; that "I could feel the pains of people hitting me in my face, in the back of head, in my upper torso, my chest, my body"; that "I was slammed toward the ground, face down"; and "when I fell to the ground, I felt the pain because I hit my face into the ground."  (*Id.*, at 86:9-13, 86:23-25, 87:7-13.)

Cpl. Fogle admitted to punching Jackson, using OC spray against Jackson, and being involved in the takedown of Jackson.  (Dkt. 158-4 at 67:7-14, 67:15-19, 81:9-24.)  Lt. Merzig admitted to kneeing Jackson and being involved in the takedown of Jackson.  (*Id.* at 50:3-16, 51:19-21.)  Ofc. Bolton and Ofc. Smith

admitted to seeing Lt. Merzig's and Cpl. Fogle's conduct and being involved in the takedown of Jackson.  (*Id.*, at 99:21-100:3, 109:11-23.)

Heather DeVore,[1] M.D. ("Dr. DeVore"), testified that Jackson "had red eyes," "was tearing," and had "clear snot draining from his nose."  (Dkt. 158-5 at 20:20-24.)  Dr. DeVore testified that a computer tomography ("CT") scan "showed a broken nose, fractures in two places."  (*Id.*, at 39:22-25.)  Dr. DeVore further testified that Jackson had "abrasions or scrapes on his forehead" and "he was unresponsive."  (*Id.*, at 21:2-3, 21:20-23.)  Consequently, Dr. DeVore provided supplemental oxygen, placed an intubation tube, placed an oral airway, placed an orogastric tube and started intravenous fluids ("IV").  (*Id.*, at 22:16-23:2, 23:22-25, 31:1-8.)  Dr. DeVore described this as, "We started to breathe for him."  (*Id.*, at 27:17-25; see also *id.*, at 31:1-8 ("made sure that he was breathing comfortably on the ventilator.").)

Edward Aulisi,[2] M.D. ("Dr. Aulisi"), testified that "one of [Jackson's] discs had herniated and was pressing to his spinal cord" that was "between the sixth and seventh cervical vertebrae, C6-7."  (Dkt. 158-8 at 25:7-10, 25:12-13.)  Dr. Aulisi also testified that Jackson had a "paracentral disc protrusion at the level above that, at C5-6."  (*Id.*, at 25:14-23.)  Dr. Aulisi further testified that Jackson was experiencing "neck pain" and "pain radiating . . . into his shoulder and into

---

[1] Dr. DeVore was the emergency room doctor who provided care and treatment to Jackson.  (Dkt. 158-5 at 19:18-20:1.)

[2] Dr. Aulisi was the neurosurgeon who performed the surgery on Jackson's herniated disc.  (Dkt. 15-8 at 25:4-23.)

his right arm." (*Id.*, at 26:15-20.)  Consequently, Dr. Aulisi "did a procedure where we approached this from the front part of his neck through a small incision."  (*Id.*, at 26:21:27:13.)  Dr. Aulisi made that decision because Jackson was "at risk for paralysis or permanent nerve injury."  (*Id.*, at 27:16-28:2.)

Carole Giunta,[3] Ph.D. ("Dr. Giunta"), testified that "Mr. Jackson suffers from post-traumatic stress disorder pursuant to the May 5th, 2015, event."  (Dkt. 158-6 at 53:1-9.)  Dr. Giunta explained that post-traumatic stress disorder ("PTSD") "is a psychological condition that someone can sustain after a markedly stressful event."  (*Id.*, at 53:10-15.)  Dr. Giunta further explained that she used "the DSM-5, which is our diagnostic handbook," to form her opinion that the defendant officers caused Jackson's PTSD.  (*Id.*, at 54:7-13.)

During closing argument, the defendants asked the jury to ignore that only Jackson's version of events was consistent with Jackson's injuries.  (Dkt. 158-12 at 75:19-21 ("You have to be the judge of the credibility here, not about what makes most sense about what injuries occurred.").)  Defendants' post-trial motions ask the Court to do the same.  The Court should deny the defendants' motions.

## II. ARGUMENT

"The Government now wants another bite at the apple, asking this Court to either reverse that verdict outright or at least permit a replay.  But in law, as in

---

[3] Dr. Giunta was Jackson's expert on clinical psychology.  (Dkt. 158-6 at 42:23-43:3.)

life, there are rarely do-overs." *Morris v. Pruitt*, 308 F. Supp. 3d 153, 159-60 (D.D.C. 2018).

### A. The Court should deny the defendants motion for judgment as a matter of law.

### 1. The jury was not required to accept the defendants' version of events.

The jury was properly instructed that "you alone determine whether to believe any witness and to what extent[.]" (Dkt. 114 at 5.) This means that the jury was not required to accept the defendants' version of events. *United States v. Project on Gov't Oversight*, 454 F.2d 306, 313 (D.C. Cir. 2006) ("Evaluation of the credibility of witnesses must be left to the fact-finder."). The jury found that Jackson did not grab Lt. Merzig's duty belt. (Dkt. 139 at 10.) That Jackson did not pin Lt. Merzig against a car. (*Id.*, at 10, 12.) And that Jackson was not moving an arm or loose handcuff. (*Id.*, at 12.)

The jury found that Cpl. Fogle's admitted punch (or "straight strike") was excessive. (*Id.*, at 10.) That Cpl. Fogle's admitted use of oleoresin capsicum ("OC") spray was excessive. (*Id.*, at 12.) That Lt. Merzig and Cpl. Fogle punched (or struck) Jackson, in addition to Cpl. Fogle's admitted punch and Lt. Merzig's admitted knee strike. (*Id.*, at 13.) And that Ofc. Scott and Ofc. Bolton saw unlawful force and failed to intervene. (*Id.*, at 11.)

The jury also found that Jackson was not actively resisting arrest when Cpl. Fogle deployed oleoresin capsicum ("OC") spray. (*Id.*, at 12.) That Jackson was not actively resisting arrest when he was slammed facedown on the ground. (*Id.*)

And that Lt. Merzig, Cpl. Fogle, Ofc. Scott, and Ofc. Bolton's decision to slam Jackson facedown on the ground was excessive. (*Id.*)

The defendants argue that Jackson was required to testify in the negative. (Dkt. 156 at 7.) The defendants make these arguments without citation to any rule of evidence or case law. The jury found that Jackson did not grab at Lt. Merzig's duty belt or pin Lt. Merzig against a car or swing a loose handcuff or otherwise actively resist. (Dkt. 139 at 10, 12.) That Cpl. Fogle "punched or struck Mr. Jackson *before* he was fully handcuffed, other than Defendant Fogle's 'straight-strike'[.]" (Dkt. 139 at 13.) And that Lt. Merzig "punched or struck Mr. Jackson *before* he was fully handcuffed, other than . . . Defendant Merzig's knee-strike[.]" (*Id.*) The jury was not required to accept the defendants' testimony to the contrary.

### 2. The defendants are not entitled to qualified immunity on the Fourth Amendment claims.



(Defs' Ex. 9 at 1, 2.) As shown in Defendant's Exhibit 9, "a strike the head with a hard object" is considered "deadly force." (*Id.*, at 2.) Under the defendants' own general order, deadly force is permissible only when "(1) When it is necessary and objectively reasonable **AND,** (2) To defend himself/herself or another from an

actual or threatened attack that is limited and could result in death or serious bodily injury." (*Id.* at 7.) Again, the jury found that Lt. Merzig and Cpl. Fogle repeatedly punched Jackson before the takedown. (Dkt. 139.) The jury specifically rejected the defendant officers' versions that Jackson went for Lt. Merzig's duty belt or weapons or actively resisted arrest by punching or swinging his arms. See *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("Where the suspect poses to immediate threat to the officer and no threat to others," officers may not use deadly force to apprehend the suspect.).

The standard for qualified immunity is whether the officers' actions are objectively reviewed reasonable in light of the facts and circumstances confronting them. *Scott v. Harris*, 550 U.S. 372, 381 (2007); *Graham v. Connor*, 490 U.S. 386, 397 (1989). The subjective intent or motivation of the officer is irrelevant. *Graham*, 490 U.S. at 397. The totality of the circumstances should be considered, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, . . . Whether he is actively resisting arrest or attempting to evade arrest by flight[.]" *Id.*, at 396.

The *Graham* factors favor Jackson. The crime (or crimes) at issue did not involve acts of violence. The jury found that Jackson was at most passively resisting. As such, Jackson did not oppose an immediate threat to the safety of the officers or others. Nor was Jackson attempting to flee. Indeed, Jackson testified that he was attempting to comply with the defendant officers' commands

but was unable to due *their* conduct.  (Dkt. 158-2 at 85:4-10.)  Furthermore, Jackson's injuries were severe.

"Although we accept as true the fact that Smith was not actively resisting, a reasonable officer who happened on the scene could reasonably misconstrue Smith's unresponsiveness as resistance requiring the minimal use of force." *Smith v. Ball State Univ*, 295 F.3d 763, 771 (7th Cir. 2002); see also *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) (en banc) ("[W]e draw a distinction between a failure to facilitate an arrest and active resistance to arrest.").  In this case, the defendants officers employed more the "minimal use of force" and failed to intervene upon seeing that.  This Court should find that the defendant officers are not entitled to qualified immunity.

### 3.  The defendants are not entitled to qualified privilege on the assault and battery claims.

The test for qualified privilege for assault and battery claims is not the same as the test for qualified immunity for Fourth Amendment claims.  *District of Columbia v. Chinn*, 839 A.2d 701, 707 (D.C. 2003).  "Where the excessive force is the product of a battery . . . which escalates in an unbroken manner into excessive force, the cause of action is a battery alone, with the privilege having ended at the point where excessive force began."  *Id.*  "[A] battery tortfeasor is liable for the full range of consequences, intended or not, including harm and transferred liability."

The jury answered "no" to the question, "Mr. Jackson was actively resisting when he was taken to the ground?"  (Dkt. 139 at 12.)  Timonthy Longo[4] ("Longo") testified, without objection, that officers are trained "[t]o take immediate steps to prevent" a passively resisting person from being struck in the head or neck area.  (Dkt. 158-5 at 15:19-16:6.)  The jury found that Ofc. Scott and Ofc. Bolton did not do that.  (Dkt. 139 at 11-13.)  Longo testified, without objection, that a takedown is a use of force.  (Dkt. 158-5 at 12:24-25.)  Longo also testified that officers are trained to prevent head injuries while performing a takedown.  (*Id.*, at 14:21-1.)  Significantly, the jury found that Jackson was not actively resisting arrest when he was taken down.  (Dkt. 139 at 12.)

Given the lower standard for assault and battery claims, this Court should find that the qualified privilege does not apply.

### 4. Jackson proved that the defendants caused his injuries and damages.

Jackson testified that he did not have any bruises, lacerations, bleeding or pain prior to the interaction with the defendant officers.  (Dkt. 158-3 at 30:21-31:10.)  Jackson testified that after the interaction with the defendant officers:

> It was painful.  I couldn't stand up to walk like that.  They dragged me over there, set me on the curb.  My back was hurting.  My neck was hurting.  My whole face was burning.  It was in pain.  It felt like every time my heart beat, you could feel like a headache, like a pulse throughout my face and everything.

---

[4] Timohty Longo was Jackson's expert on policing practices.  (Dkt. 158-6 at 90:4-9.)

(Dkt. 158-2 at 95:8-21.)   Jackson was subsequently taken to the hospital and received treatment for his injuries.  (Dkt. 159-4; Dkt. 159-5; Dkt. 159-6.)

Dr. Devore explained that blunt force trauma stems from forceful impact. (Dkt. 158-5 at 68:13-15.)  Dr. DeVore testified that Jackson suffered blunt force trauma to his head.  (*Id.*, at 68:16-18.)  Dr. DeVore testified that "being punched in the face" or being "taken to the ground" would be "consistent with the blunt trauma that I saw in his face."  (*Id.*, at 25:2-11.)  Dr. DeVore also testified that Jackson's loss of consciousness was consistent with having suffered "blunt-force trauma."  (*Id.*, at 48:2-12.)  Dr. DeVore additionally testified that Jackson "displayed symptoms . . . consistent with being pepper-sprayed[.]" (*Id.*, at 60:18-21.)

Dr. Aulisi testified that a punch or tackle can cause disc herniation.  (Dkt. 158-8 at 28:21-24.)  Dr. Aulisi explained that "[p]eople that have a sudden trauma or injury and then experience symptoms related to a disc herniation, those are fairly straightforward to figure out the timing of when that occurred."  (*Id.*, at 29:18-25.)  Dr. Aulisi further explained that "the type of disc herniation that [Jackson] had would be expected to cause symptoms that were persistent and aggravating enough that a patient sought care for that."  (*Id.*, at 30:1-10; see also *id.*, at 93:20-22 ("It would be hard to have a disc herniation that size walking around completely asymptomatic.").)

Jackson testified that he was diagnosed with PTSD "[a]t the D.C. Jail in 2015."  (Dkt. 158-3 at 14-16; *id.*, at 93:20-24 (testifying that that was Jackson's

first PTSD diagnosis).  Dr. Giunta testified that Jackson "was diagnosed with PTSD in May 2015 upon entering the D.C. jail." (Dkt. 158-6 at 58:1-5.)  Dr. Giunta explained that her opinion was consistent with the jail psychologist's diagnosis of PTSD.  (*Id.*, at 67:21-68:5.)  And that the defendant officers caused Jackson's PTSD.  (*Id.*, at 57:16-58:7.)

Given the severity of Jackson's injuries and the temporal proximity of medical care and treatment, there is no doubt that the defendant officers caused Jackson's damages.  The jury was instructed that "[a]n act is a proximate cause of an injury if it was a substantial factor in bringing about that injury[.]"  (Dkt. 114 at 13.)  The jury was free to accept Jackson's testimony together with the defendant officers' admissions at trial.

**B. The Court should deny the defendants motion for a new trial.**

**1. Dr. DeVore's lay opinions were proper under Fed. R. Evid. 701 and were not unfairly prejudicial under Fed. R. Evid. 403.**

Fed. R. Evid. 701 provides lay opinions are permissible so long as the opinions are "rationally based on the witness's perception," "helpful clearly understanding the witness's testimony or to determine a fact in issue," and "not based on scientific, technical, or other specialized knowledge[.]"  (See also Dkt. 158-1 at 30:17-31:9.)  The Court explained that "there is clear probative value stemming from what the officers accompanying plaintiff to the hospital told Dr. DeVore had occurred and how[.]" (*Id.*, at 31:23-25.)  The Court also explained that

"it is helpful and relevant to whether the encounter with plaintiff involved officer misconduct." (*Id.*, at 31:6-9.)

The Court cited *United States v. Lieu*, 963 F.3d 122, 128 (D.C. Cir. 2020). (Dkt. 158-1 at 31:18-25.)  In *Lieu*, the D.C. Circuit explained that "Rule 403 establishes a high barrier to justify the exclusion of relevant evidence, by requiring that its probative value must be 'substantially' outweighed by considerations such as 'unfair' prejudice." *Lieu*, 963 F.3d at 128.  The defendants do not contend that the Court was wrong in its analysis under *Lieu* or Fed. R. Evid. 701.  Instead, the defendants argue that Dr. DeVore presented opinions about the defendants' credibility.  (Dkt. 156 at 20-21.)  That is not what happened.

Dr. DeVore testified that the officers "didn't tell me much initially."  (Dkt. 158-5 at 24:8.)  That "I was concerned that it may have been more than a minor car crash because he was unresponsive and because he had trauma to his face." (*Id.*, at 24:16-20.)  "I was concerned that . . . some other trauma that was causing the injuries that I observed."  (*Id.*)  "I didn't feel comfortable that I had all the information based on what I saw[.]"  (*Id.*, at 24:25-25:3.)  "My impressions were that it wasn't -- it was incomplete."  (*Id.*, at 25:12-15.)  "I was concerned that there was more information that I wasn't getting."  (*Id.*)  None of Dr. DeVore's testimony can fairly be characterized as opinions about the credibility of the defendants.

**2. Dr. DeVore's testimony about why Jackson is memorable, to which defendants did not object, was also proper.**

Dr. DeVore testified, without objection, that Jackson was a memorable patient. (Dkt. 158-5 at 45:9-23; *cf.* Dkt. 156 at 22 (wrongly arguing that the Court made a ruling.).) In closing, Atty. Sulton highlighted that "[t]he defense asked her, 'Hey, you've testified for Mr. Jackson before'" and "I asked her what her motivation was from that." (Dkt. 158-12 at 55:1-15; see also Dkt. 158-5 at 71:14-6.) The defendants have not shown that the testimony was improper or that the accurate statement made in closing was improper. The defendants attacked Dr. DeVore's credibility by suggesting an ulterior motive. Atty. Sulton corrected that misimpression by showing that she was motivated by the severity of Jackson's injuries. (Dkt. 158-5 at 71:25-72:8 ("I felt like I wasn't getting a complete picture or a story from the officers who were there, and it affected me to the point where I felt like I needed to tell my experience and my story in caring for him.").)

### 3. Evidence about Jackson's disc herniations and subsequent surgery and recovery were properly admitted.

Jackson submits that expert testimony on causation was unnecessary under *Lewis v. Washington Metropolitan Transit*, 19 F.3d 677 (D.C. Cir. 1994). In *Lewis*, the D.C. Circuit explained that there are three exceptions to the general rule requiring expert testimony. *Id.*, at 678-79. First, "when the injury developed within a reasonable time after the accident." *Id.* Second, "when causation is clearly apparent." *Id.* And third, "when the cause of injury relates to matters of common experience, knowledge, or observations of laypersons." *Id.* *Lewis* also

explains that "[e]xpert testimony may assist in the determination" of whether any of the exception applies.  *Id.*  That is the situation here.

Dr. Aulisi testified that Jackson "had neck pain," "had pain radiating, sort of, into his shoulder and into his right arm," and "these are all signs and symptoms of a nerve being compressed typically by a herniated disc." (Dkt. 158-8 at 26:15-20.)  Dr. Aulisi explained that "[p]eople that have a sudden trauma injury and then experienced symptoms related to a disc herniation, those are fairly straightforward to figure out the timing of when that occurred." (*Id.*, at 18-25.)  Dr. Aulisi further explained that "the type of disc herniation that [Jackson] had would be expected to cause symptoms that were persistent and aggravating enough that a patient would have sought care for that." (*Id.*, at 30:1-10.)  Dr. Aulisi also explained that "[i]t would be hard to have a disc herniation that size walking around completely asymptomatic." (*Id.*)  And Dr. Aulisi testified that "an MRI scan of his neck [] demonstrated the disc herniation." (*Id.*, at 25:16-23.)

Dr. Aulisi described Jackson's disc herniation as "moderate to severe[.]" (*Id.*, at 29:1-4.)  Dr. Aulisi testified that Jackson was treated as an "urgent patient." (*Id.*, at 38:13-22.)  Dr. Aulisi explained that "an urgent procedure is a procedure that should be . . . within 24 to 72 hours[.]" (*Id.*, at 37:2-11.)  This was because "given the nature of [Jackson's] disc herniation," Jackson was "at risk for paralysis or a permanent nerve injury." (*Id.*, at 27:17-25; see also *id.*, at 34:1-3; 37:1-11.)

The first exception applies because Jackson's injuries occurred after his interaction with the defendant officers and Jackson was seen the same day by medical professionals at the hospital.[5] In *Lewis*, the D.C. Circuit ruled that the first exception applied when treatment was sought six days after the event. *Lewis*, 19 F.3d at 679. The second and third exceptions apply because it is obvious that repeatedly punching someone in the head and neck—and then slamming them facedown on the ground—will cause the blunt force trauma injuries that Dr. DeVore and Dr. Aulisi testified Jackson was treated for.

Lastly, even if expert testimony were necessary to establish causation. Dr. Aulisi's opinions furnish the necessary opinions.

### 4. Atty. Sulton appropriately argued that the defendants failed to present any evidence supporting the defense theory that Jackson's severe physical injuries were caused by the slow speed, minor accident involving a moped.

During closing argument, Attorney Sulton pointed out that "[t]here is no evidence that Jackson had any injuries to his head or face prior to his interaction with the police officers." (Dkt. 158-12 at 49:15-20.) That "[t]here's no evidence that Jackson was going in and out of consciousness prior to his interaction with the defendant police officers." (*Id.*) And that "[t]here's no evidence that Mr. Jackson was experiencing any symptoms of disc herniation" prior to his interaction with the defendant officers. (*Id.*, at 50:11-21.)

---

[5] (Dkt. 158-3 at 30:21-31:10 (Jackson testified that he did not have any prior injuries.); Dkt. 158-2 at 95:8-21 (Jackson testified that he had injuries after the interaction with the defendant officers.); (Dkt. 159-4 (Jackson received immediate treatment); Dkt. 159-5 (same); Dkt. 159-6 (same).).)

During defense counsel's closing argument, defense counsel argued that Jackson lied to the jury when he said there was no damage to the car following the accident. (*Id.*, at 66:13-67:2, 67:10-13.) Defense counsel buttressed that contention on Exhibit 1J (a photograph of the car) and argued that the car's condition in that photograph was consistent with the moped accident. (*Id.*) From there, defense counsel argued that the moped accident caused Jackson's disc herniation injuries. (See, e.g., *id.* at 78:6-14; see also Dkt. 158-5 at 68:4-21, 69:12-14 (defense counsel suggesting through questioning that the accident caused Jackson's broken nose.).)

During rebuttal, Atty. Sulton pointed out that Exhibit 1J does not do the work that defense counsel claimed for it. Atty. Sulton explained that the defendant officers did not "show [the jury] before and after pictures" of the car. (Dkt. 158-12 at 85:7-25.) That one would need to know the condition of the car prior to the moped accident to draw the conclusion that the condition shown in Exhibit 1J was caused by the accident. (*Id.*) Atty. Sulton also explained that the defendant officers "didn't call the moped driver to testify on their behalf." (*Id.*, at 85:25-86:1.) That argument was proper, as it shows that the defendant officers did not adduce any evidence as to the impact of the moped accident.

Atty. Sulton's statement was not an argument about a missing witness. Rather, Atty. Sulton was making the point that the defendant officers failed to adduce evidence supporting their case theory. The D.C. Circuit rejected similar arguments in *United States v. Lawson*, 494 F.3d 1046 (D.C. Cir. 2007). In *Lawson*,

a criminal case, a lawyer argued that there were "a whole bunch of questions that are completely unanswered by the government's evidence" and used as an example the absence of testimony from a witness. *Id.*, at 1052. The D.C. Circuit explained that "[e]mphasizing the lack of one form of evidence—in this instance, testimony [][]—is not always or necessarily an argument that a witness not called would have provided testimony harmful to the [opposing party's] case." *Id.*, at 1053. The D.C. Circuit relied on its opinion in *Burgess v. United States*, 440 F.2d 226, 235 (D.C. 1970): "[T]he significance of the absence of a witness is not confined to an inference that if produced [the] testimony would be unfavorable to the party who has the power to produce [the witness]."

Atty. Sulton did not ask the jury to infer that the moped driver would have testified against the defendant officers' case. "Counsel was making a permissible argument based on the absence of evidence that [the defendant officers] had failed to prove" that Exhibit 1J shows a condition caused by the slow speed accident. *Lawson*, 494 F.3d at 1053.

### 5. The trial evidence supports the verdict.

Jackson testified that Lt. Merzig and Cpl. Fogle gratuitously punched him, in addition to being subjected to OC spray and a violent takedown. (Dkt. 158-2 at 72:20-73:2.)  Ofc. Scott and Ofc. Bolton admitted to being involved in the takedown. (Dkt. 158-4 at 99:21-100:3, 109:11-23.)  The jury found that, prior to the takedown, Ofc. Scott and Ofc. Bolton saw Lt. Merzig and Cpl. Fogle punching Jackson. (Dkt. 139 at 11.)  The jury found that that punching was excessive. (*Id.*,

at 13.)  The jury also found that the takedown was excessive.  (*Id.*, at 20.)  And the jury found that Jackson was not actively resisting the officers.  (Dkt. 139 at 10-13.)

There was ample testimony from Jackson that he had physical pain suffering.  Jackson testified about the injuries to his face, head, neck, and had lost consciousness.   There was also testimony about the pain of treatment and recovery.  There was testimony from Dr. DeVore that Jackson had injuries to his face, head, and lost consciousness.  There was testimony from Dr. Aulisi that Jackson had pain and injuries to his neck.  Additionally, there was testimony from Jackson that he had emotional pain and suffering.  There was testimony from Dr. Giunta establishing that Jackson had PTSD.

The defendants' arguments amount to protestations that the jury should have believed them over Jackson.  That is not a basis to reverse a jury's verdict.

It was not error to deny the defendants' requested instruction.  (Dkt. 158-10 at 10:8-11:10.)  There was no claim for unlawful arrest.  As the Court explained, "there no reason to think the jury will consider the evidence for any purpose relating to a claim for unlawful arrest.  (*Id.*)  And the evidence has probative value because "[t]he jury must weight the totality of the circumstances," which includes "any commands they gave, as has been elicited, and any commands they didn't give."  (*Id.*)

Lastly, the defendants waived any argument related to inconsistencies in the verdict.  The defendants did not object or ask the Court to have the jury correct

any alleged inconsistencies.  Furthermore, the Court can reconcile the verdict by changing the answers to verdict question numbers 13 and 17 to yes against each defendant.  The takedown was clearly a battery and the defendant officers admitted to doing it.

### 6. Remittitur is inappropriate in this case.

The jury's compensatory damages award is extraordinary, but that does not mean that remittitur is appropriate.  The defendants argue that Jackson only proved "eye irritation[.]"  (Dkt. 156 at 32.)  We disagree.  There was ample evidence that Jackson suffered severe physical and emotional injuries, and those injuries persisted.

The defendants did not object to the damages part of the verdict form. Indeed, it was the defendants who proposed a single line for compensatory damages.  (Dkt. 158-7 at 26:25-27:11.)  That (strategic) decision meant that Jackson would be awarded a single sum.  The Court should not now permit the defendants to argue that that was wrong.

*Park v. Shiflett*[6] is distinguishable.  250 F.3d 843 (4th Cir. 2001).  *Park* is a two-plaintiff case involving a husband and wife.  *Id.*, at 848.  The husband was awarded $50,000 and the wife was awarded $450,000.  *Id.*, at 849.  The Fourth Circuit reduced the $50,000 award because "there is no evidence in the record to

---

[6] "[N]othing can so militate against the effective administration of justice and the proper regard for the law of the land as unlawful and reckless conduct on the part of officers were charged with its enforcement."  *Park v. Shiflett*, 250 F.3d 843, 854 (4th Cir. 2001) (quoting *Crosswhite v. Barnes*, 139 VA. 471, 124 S.E. 242 (Va. App. 1924).

sustain a damage award" for the husband. *Id.*, at 853. The Fourth Circuit reduced the wife's award to $300,000 based on the amount the wife would incur in medical expenses. *Id.* The plaintiffs in *Park* simply did not seek all of the relief that Jackson sought in this case. Nor did either plaintiff have the severity of injuries that Jackson experienced.

*Phillips v. District of Columbia*, 458 A.2d 772 (D.C. 1983), *Smith v. Executive Club, Ltd.*, 458 A.2d 32 (D.C. 1983), and *John W. Johnson, Inc. v. Basic Const. Co.*, 292 F. Supp. 300 (D.D.C. 1968), are similarly distinguishable. *Phillips* did not involve severe physical or emotional injuries. The plaintiffs in *Smith* did not claim severe physical or emotional injuries. And *John Johnson* did not involve severe physical or emotional injuries. The claims in *John Johnson* were breach of contract, negligence and interference with contract rights. 292 F. Supp. at 301.

In the event that the Court determines that remittitur is appropriate, we submit that the Court should consider inflation when comparing prior jury verdicts and remittitur orders. We suggest that the Court should use the United States Bureau of Labor Statistics calculator found at https://data.bls.gov/cgi-bin/cpicalc.pl for adjustment purposes.

### C. Conclusion

The Court should enter an order denying defendants' post-trial motions.

Date: February 22, 2024.        Respectfully submitted,

*/s/ William F. Sulton*

WILLIAM F. SULTON

THE SULTON LAW FIRM LLC
2745 N. Dr. Martin Luther King Jr. Drive
Suite 202
Milwaukee, WI 53212
414-477-0088 (direct)
414-250-7676 (fax)
william@sultonlaw.com

MEREDITH L. KINNER
JOHN T. MCGOWAN

KINNER & MCGOWAN PLLC
1305 C Street NE
Washington, D.C. 20002
202-892-3711
mkinner@kinnermcgowan.com
jmcgowan@kinnermcgowan.com

*Counsel for Plaintiff*